IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2966
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES OSCAR COOPER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(July 6, 1992)

Before POLITZ, Chief Judge, and WILLIAMS and DUHÉ, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This appeal results from a series of undercover purchases of crack cocaine, search warrant executions, and arrests at Cooper's Sportsman's Lounge in Houston, Texas.  Appellant Cooper was convicted and sentenced under a seventeen-count indictment charging various firearm and narcotics offenses.  He raises a number of challenges to his conviction:  (1) the duplicitous nature and ambiguity of the jury verdict as to his conspiracy count; (2) the multiplicitous nature of the convictions for leasing a crack house as well as firearm counts during and in relation to drug trafficking; (3) the insufficiency of the evidence on the firearm

count convictions as well as the sentencing of such counts; (4) the district court's failure to give a requested jury instruction; (5) the district court's overruling of a suppression of evidence motion; (6) and finally, the prosecutor's improper commentary on Cooper's failure to testify.  Finding no reversible error, we affirm.


I.  FACTS AND PRIOR PROCEEDINGS

In March 1990, officers of the Narcotics Division of the Houston Police Department and officers of the Drug Enforcement Administration received information from a confidential informant that large quantities of crack cocaine were being sold from a private club located at 3355 Yellowstone Boulevard, Houston, Texas. The officers initiated an investigation and learned that crack cocaine was being sold from that address at Cooper's Sportsman's Lounge ("Lounge"), a highly fortified club located in the upstairs level of a building.  To enter the premises, it was necessary to go through a series of doors, including one which electronically opened with a buzzer, and another which was bolted by hand.  Over an eight-month period, between March 2, 1990 and October 16, 1990, at least nine undercover purchases of cocaine were made and six search warrants were executed at the property.[1]  As a result of

_____

[1] For clarity and brevity, we do not set out the specifics of each of the police instances of execution of the search warrants (which at trial were called raids).  In essence, the modus operandi was as follows:  the police, often in response to information provided by an informant, would enter the Lounge, sign the customer ledger, submit to a search for weapons, pay a dollar for admission, and purchase one rock of crack cocaine for $ 50.  Further, unless

such searches, eleven firearms and over 234 grams of crack cocaine were seized from the Lounge.

Cooper's involvement was evident from the outset. On four occasions, Cooper was present at the Lounge during or immediately following the execution of the search warrants. On May 19, 1990, officers seized 86 grams of crack cocaine and recovered various ledgers and records specifically implicating Cooper. The ledgers clearly indicated that Cooper was involved in the distribution of crack cocaine and perhaps the supply of narcotics.[2] During this particular search, Cooper arrived at 3355 Yellowstone during the execution of the search warrant, and told a DEA agent that he was the owner of both the club and the whole block of 3300 Yellowstone.

---

relevant, we do not specify who made the purchases of the cocaine, who executed the search warrant, or who performed the raid. Cooper places significant emphasis on Eddie Henry, a police informant and cooperating individual, present in many of the transactions at the Lounge. At trial, Henry testified that he had been addicted to cocaine, although he repeatedly denied being on drugs during the investigation. He stated that he suffered a relapse around October 1990 and was in a detoxification center between October 1990 and January 1991. Testimony, however, revealed that Henry was admitted as a referral from Ben Taub Hospital for cocaine abuse to a detoxification center on September 5, 1990, and was released from the facility against medical advice on September 10, 1990, in the midst of his undercover investigation. Contrary to Cooper's contentions, however, we do not sit as a "de novo jury." United States v. Menesses, __ F.2d __, 1992 WL 107834 (5th Cir. May 22, 1992) (No. 90-2660). In the instant case, the jury convicted Cooper on all counts in spite of the credibility issue of the informant. We do not disturb this conviction. A jury is "free to choose among reasonable constructions of the evidence." United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

    [2] The testimony at trial revealed that the ledgers appeared to be a running inventory of a street level drug distribution business; further, the initials J.C. were present throughout the ledgers--for instance "$350.00 to J.C. for 7 stones."

Moreover, he stated that he was aware of the problems at the Lounge and of the frequent police searches. Most critically, when asked why the club was leased to drug dealers, Cooper responded: "Well, I got to make money."

On May 26, 1990, two uniformed Houston police officers entered the club to perform a club check. Upon entering the club, the officers observed a person in possession of crack cocaine in the bar area, and overheard two people arguing over $200 in an office east of the bar area. The officers knocked on the office door and were told to enter. They found Cooper sitting on a couch holding a bag which contained approximately two grams of crack cocaine. Further, the officers saw two 12-gauge shotguns in an open closet only six to eight feet from Cooper.

On October 4, 1990, Cooper was present at the Lounge when police officers undertook to execute a search warrant. Cooper denied entry and demanded to see their supervisor. Even after the supervisor arrived, Cooper refused to allow the search warrant to be executed. The police officers forced entry into the property. Cooper was observed in the hall area of the Lounge and the officers recovered a bag containing over one gram of crack cocaine on a window ledge near Cooper's position.

Less than two weeks later, Cooper was again present at the Lounge. When Henry returned to make another undercover cocaine buy, Cooper admitted Henry to the club and provided the crack that Henry purchased. Henry testified that upon entering the Lounge, he overheard a person ask the doorman to deliver a baby jar and a can

4

of chewing tobacco to Cooper.  A subsequent search revealed that both of these containers were filled with crack cocaine.

On March 18, 1991, a federal grand jury returned a second superseding indictment charging Cooper with seventeen drug-related offenses in connection with his operations at the Lounge.  Count 1 alleged that Cooper had conspired from March 2 to October 16, 1990 knowingly and intentionally to distribute and possess with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and knowingly and intentionally to manage and control and make available a place for the purpose of distributing and using crack cocaine in violation of 21 U.S.C. § 856(a)(2).  Count 2 alleged that during the period of the conspiracy Cooper used and carried firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).  Counts 4, 6, 9, 15, and 17 charged separate violations of § 924(c)(1), using or carrying a firearm during and in relation to a drug trafficking crime.  Counts 3, 5, 7, 8, 10, 11, 12, 13, 14, and 16 charged Cooper with separate violations of 21 U.S.C. § 856-- maintaining building for use as a crack house.  On appeal, the government admits that it may be difficult to show that Cooper committed separate § 856 offenses on the dates alleged in counts 10, 11, 12 and 13.  Consequently, the government is willing to dismiss them.  Under the concurrent sentence doctrine, however, Cooper's sentence is not dependent on these counts.

The jury convicted Cooper on all seventeen counts.  Prior to sentencing, the government dismissed count 2, and the district

court sentenced Cooper to a total of 360 months in prison.  He was sentenced to 188 months on the eleven drug offenses, 60 months on count 4, consecutive to the sentence for the drug crimes, and 112 months on counts 6, 9, 15, and 17, concurrent to each other but consecutive to the other sentences.  Cooper timely appealed.

### III.  DISCUSSION

A. Duplicitous[3] Charge and Ambiguous Verdict Under Count 1

1.  Duplicity

Count 1 alleged a conspiracy to distribute over 50 grams of crack cocaine (in violation of 21 U.S.C. § 841(a)(1)) and to maintain a crack house (in violation of 21 U.S.C. § 856(a)(2)). Cooper contends that count 1 charges two separate conspiracies and must be dismissed for duplicity or, alternatively, he must be resentenced.  The district court instructed the jury as follows:

> I want you to understand if you find the defendant guilty of the conspiracy charge in Count One, you need find that he conspired to agree to accomplish one of the purposes or objects of the conspiracy set out in Count One, but you must agree unanimously as to which object or objects he agreed to accomplish.
> It's sufficient that the Government prove an agreement or understanding to commit only

---

[3]  "`Duplicity' is the joining in a single count of two or more distinct and separate offenses." United States v. Lyons, 703 F.2d 815, 821 n.8 (5th Cir. 1983). The ban against duplicitous indictments derives from four concerns:  prejudicial evidentiary rulings at trial; the lack of adequate notice of the nature of the charges against the defendant; prejudice in obtaining appellate review and prevention of double jeopardy; and risk of a jury's nonunanimous verdict. See generally 1 **Charles A. Wright, Federal Practice and Procedure** § 142 (2d ed. 1982).

> one of the unlawful objects in order to
> convict of the conspiracy count.

As the government correctly asserts, the instruction properly stated settled law. "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for `[t]he conspiracy is the crime, and that is one, however diverse its objects.'" Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942). See also United States V. Lyons, 703 F.2d 815, 821 (5th Cir. 1983); United States v. Elam, 678 F.2d 1234, 1250 (5th Cir. 1982); United States v. Avila-Dominguez, 610 F.2d 1266, 1270 (5th Cir.), cert. denied, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). We find that the challenged instruction correctly submitted the count to the jury and was not duplicitous.

2. Ambiguity in Jury Verdict

Cooper asserts that the jury's general verdict of guilty left open the possibility that the jury convicted him only of a conspiracy to violate § 856, as opposed to § 841 or both, and thus the penalty should be assessed accordingly. According to the government, Cooper objected at trial only to the conspiracy count on the ground of duplicity and clearly erroneous instructions. Cooper failed to object on the basis of the charge and of the verdict's ambiguity--in essence that there is no way to know which statutory offense was the basis of the conviction.

Having failed to object to the form of indictment, Cooper neither requested a special verdict as to the object of the conspiracy, nor did he object to the absence of a special verdict. When the jury returned its verdict without any indication of which offenses it had found he had conspired to commit, Cooper had had further opportunity to ask the court for a clarification. Again, he failed to do so. Cooper, in seeming disregard to **Fed. R. Crim. P.** 30,[4] called this matter to the district court's attention after the jury's verdict had been recorded and the jury had been discharged. In essence, Cooper remained silent until sentencing as to the danger of being found guilty without any ascertainment of which offense he was found to have violated.

Analogous to the appellant's actions in <u>Williams v. United States</u>, 238 F.2d 215, 218 (5th Cir. 1956), <u>cert. denied</u>, 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596 (1957), Cooper did not request a clarification of the indictment or request a new trial on the ground of an incorrect charge. Consequently, unless a manifest miscarriage of injustice has occurred, this Court will not consider an appeal from error not timely called to the district court's attention. Without deciding whether there was error, we find that in any event the circumstances here do not merit a finding of a

---

[4] The rule states in relevant part:

> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

8

manifest miscarriage of justice.  See Williams, 238 F.2d at 221 (concluding that absent manifest injustice, "failure to seek relief by way of motion to correct the indictment, or by any action at time of the court's charge or after verdict, worked an effective waiver of such error [ambiguous verdict]").

3.  Sentencing

While Cooper's failure to make a timely objection to the ambiguity of the verdict constitutes a waiver of that objection, he may challenge the imposition of his sentence.  United States v. Mastrangelo, 733 F.2d 793, 800 (5th Cir. 1984) (concluding that although the appellant's failure to object to the multiplicity of the indictment before trial constituted a waiver of the multiplicity objection with regard to any alleged error in the indictment, the appellant could challenge the imposition of multiple sentences for the alleged commission of one crime).  Court decisions have established the rule that a sentencing judge faced with a conviction on a count that charged the violation of more than one statute, but where the jury failed to specify the violation found, is limited to imposing a sentence that does not exceed the maximum penalty under the statute providing the least severe punishment.  In United States v. Orozco-Prada, 732 F.2d 1076, 1083-84 (2d Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92, and cert. denied, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984), the Court withheld judgment on appellant's conviction for 30 days, allowing the government to consent to

9

resentencing under the statute within the limitation of the less severe penalty, or in the alternative, absent the government's consent, to vacate as to the count at issue and remand for a new trial. See also United States v. Quicksey, 525 F.2d 337, 341 (4th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); Brown v. United States, 299 F.2d 438, 440 (D.C. Cir.) (per curiam), cert. denied, 370 U.S. 946, 82 S.Ct. 1593, 8 L.Ed.2d 812 (1962); 8 **James WM. Moore Et Al., Moore's Federal Practice** § 8.03[2] (2d ed. 1992).

In the instant case, the less severe statute is § 856, providing a penalty of up to 20 years imprisonment, as opposed to § 841, providing a penalty of up to life imprisonment. Cooper was sentenced to 188 months, below the maximum penalty provided in § 856. Thus, according to the government, any error in failing to solicit a special verdict from the jury on count 1 was harmless.

Cooper acknowledges the less severe sentencing alternative but advocates that this less severe principle be applied in guideline calculations. In essence, if his sentence may not exceed the maximum penalty provided in § 856, it may also not exceed the penalty provided in the sentencing guidelines for § 856 offenses. Under Cooper's calculations, the sentence assessed for § 856 would be between 27-33 months once the necessary increments for prior criminal history are included.[5]

---

[5] Section 856 is governed by U.S.S.G. § 2D1.8 which provides for a base offense level of 16. According to Cooper, assuming that the presentence report ("PSR") is correct concerning adjustments, there would be an upward adjustment of 2 for his role in the offense, giving a total offense level of 18.

The government asserts that this argument ignores § 1B1.2(d) of the sentencing guidelines which provides that a conviction on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been convicted of a separate conspiracy count for each offense that he conspired to commit. U.S.S.G. § 1B1.2(d) (Nov. 1991). Further, appellant's argument ignores the commentary[6] to § 1B1.2(d) stating that where the jury's verdict fails to specify which of the charged offenses were the objects of the conspiracy, the defendant may be sentenced for the object offenses for which the court, were it sitting as trier of fact, would convict the defendant. U.S.S.G. § 1B1.2(d) comment. (n.5). See United States v. Tham, 960 F.2d 1391, 1399-400 (9th Cir. 1992) (finding that where the jury verdict failed to specify whether it had found the appellant guilty on one or both charges of conspiracy, U.S.S.G. § 1B1.2(d) was applicable).

More than sufficient evidence exists from which the district court, sitting as a trier of fact, could have found that Cooper conspired to violate § 841. Government witnesses testified to innumerable crack cocaine sales at the Lounge between March and October 1990. Further, during this seven-month period, eleven firearms and over 234 grams of crack were seized from the Lounge.

---

[6] See United States v. Anderson, 942 F.2d 606, 612-13 (9th Cir. 1991) (en banc) (finding that when reviewing the sentencing guidelines, courts should always consider the commentary and, if possible, construe the guidelines and its commentary in an internally consistent manner); see also United States v. Salazar, 961 F.2d 62, 64 n.1 (5th Cir. 1992) (citing Anderson with approval).

Cooper's involvement in the conspiracy under section 841 is equally clear. On several occasions, undercover officers found Cooper in his office in possession of crack--the same office where narcotics inventory and accounting records were kept, where over 150 grams of crack cocaine and eight of the eleven firearms seized were found, and where two pictures of Cooper and a nameplate, "J.C. Cooper," were discovered. Of course, Cooper actually admitted that he made the Lounge available to drug dealers for the purpose of distributing crack cocaine. There is ample evidence in the record to support a conviction for conspiracy to possess with intent to distribute crack cocaine.

Our review of a sentence under the guidelines "is confined to determining whether a sentence was `imposed in violation of law' or `as a result of an incorrect application of the sentencing guidelines.'" United States v. Nevarez-Arreola, 885 F.2d 243, 245 (5th Cir. 1989) (per curiam) (citing 18 U.S.C. § 3742(e)). Further, we affirm applications of the guidelines when they are based on factual findings that are not clearly erroneous. United States v. Medina-Saldana, 911 F.2d 1023, 1024 (5th Cir. 1990). "A factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole." United States v. Sanders, 942 F.2d 894, 897 (5th Cir. 1991).

We find that the district court did not err in using § 2D1.1 (unlawful manufacturing, importing, exporting, or trafficking-- including possession with intent to commit these offenses) as opposed to § 2D1.8 (renting or managing a drug establishment) for

12

purposes of calculating Cooper's base offense level.  Not only was the district court's assessment a correct application of the guidelines, but also the district judge ultimately departed downward from the guidelines, opting not to impose the recommended 188 month minimum sentence under a 36 offense level (range of 188-235 months) for a § 841 violation.  We find no clear error in the district court's sentence under count 1, and we uphold it.

B.  Multiple Counts on Making Building Available as a Crack House

Cooper was convicted on ten counts[7] (each alleging a different date) of making a building available for the purpose of unlawfully distributing and using crack cocaine in violation of 21 U.S.C. § 856(a)(2).[8]  He contends that his indictment is multiplicitous.[9] Using analogy to case law addressing the existence of a single,

---

[7]  On appeal, as stated above, the government opted to dismiss counts 10-13, but this has no bearing on Cooper's sentence.

[8]  To convict Cooper under § 856(a)(2), the jury had to find that Cooper (1) managed or controlled Cooper's Sportsman's Lounge (2) either as an owner, lessee, agent, employee or mortgagee and (3) knowingly and intentionally rented, leased or made available for use with or without compensation, the building for the purpose of unlawfully manufacturing, storing, distributing or using a controlled substance.  United States v. Chen, 913 F.2d 183, 187 (5th Cir. 1990).

[9]  Multiplicity is the charging of a single offense in multiple counts of an indictment or information. United States v. Lemons, 941 F.2d 309, 317 (5th Cir. 1991) (per curiam).  A multiplicitous indictment raises the danger that a defendant will receive more than one sentence for a single offense.  United States v. Swaim, 757 F.2d 1530, 1537 (5th Cir.), cert. denied, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985).  See 1 **C. Wright,** at 469-70.

ongoing gambling business,[10] Cooper asserts that he violated § 856 only once and that the indictment unfairly converted his single, continuing offense into multiple crimes. He states that this produces great harm because, while these sentences run concurrently, multiple § 856 convictions allow the government to obtain multiple firearm convictions pursuant to 18 U.S.C. § 924, sentences which run consecutively.

Congress establishes and defines the offenses in a statute. See Sanabria v. United States, 437 U.S. 54, 70, 98 S.Ct. 2170, 2182, 57 L.Ed.2d 43 (1978) ("Whether a particular course of conduct involves one or more distinct `offenses' under a statute depends on . . . congressional choice.") (footnote omitted). Contrary to Cooper's assertion, "the double jeopardy clause imposes no restraints on the power of Congress to define the allowable unit of prosecution and punishment where all the charges are brought in one suit." United States v. McDonald, 692 F.2d 376, 377 (5th Cir. 1982), cert. denied, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). Thus, in deciding whether the district court could properly impose multiple sentences, we must determine the allowable unit of prosecution in § 856. United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). Our task is to discern Congress' intent by looking first

---

[10] Cooper places particular emphasis on United States v. Bennett, 623 F.2d 52, 54 (8th Cir. 1980) (per curiam). In Bennett, the Court scrutinized 18 U.S.C. § 1955 which expressly defines the unit of prosecution in terms of a single illegal gambling business. The Court reasoned that separate convictions under that section would be proper only if different businesses were alleged and proved.

to the plain language of the statute and then to legislative history and the overall statutory scheme of which it is a part. See United States v. Anderez, 661 F.2d 404, 406 (5th Cir. Unit B 1981) (stating that "[o]ur starting point in interpreting statutes must be the language of the statutes themselves"); United States v. Davis, 656 F.2d 153, 158 (5th Cir. 1981) (in addressing a multiplicity claim, stating that "[w]e are bound, however, to review all sources from which legislative intent may be gleaned"), cert. denied, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). See also 1 **C. Wright,** at 476-78.

We begin with the language of the statute itself. Section 856(a)(2) provides:

> [I]t shall be unlawful to . . . manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

According to the government, section § 856(a)(2) indicates that Congress has defined the allowable unit of prosecution by reference to the number of times the defendant "rents," "leases," or "makes available" a building for drug-related activities. In essence, if the defendant makes the building available once, independent of the length of time, he has committed only one crime. If he makes the building available on more than one occasion, however, the defendant has committed multiple crimes. Thus, Cooper's analogy to those cases interpreting 18 U.S.C. § 1955, a statute which

15

expressly defined the unit of prosecution in terms of "an illegal gambling business," is inapposite. The government also posits a policy argument--if this Court adopts the "single business" theory Cooper urges, drug offenders will lack incentive to stop their operations even after they are caught; they would be subject only to one conviction regardless of the number of times their "business" was reopened.

But to the contrary, Cooper urges that 21 U.S.C. § 856(a)(2) contains no statement in terms evidencing intent to make each managing, controlling, renting, leasing or making available a separate offense, and therefore separately punishable. Consequently, Cooper asks this Court to invoke the doctrine of lenity[11] for the proposition that the indictment in each count of "making available the use of the building" should not have constituted separate offenses.[12] The doctrine of lenity, however,

---

[11] Lenity functions as a tool of statutory construction. When Congress fails to indicate the allowable unit of prosecution with clarity, doubt as to congressional intent should be resolved in favor of lenity for the accused. Bell v. United States, 349 U.S. 81, 83-84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). See also 1 **C. Wright** at 478 ("Since a determination that separate offenses are involved makes possible multiple punishment for the same conduct, unless Congress had indicated clearly that it contemplates separate crimes doubt will be resolved against turning a single transaction into multiple offenses.") (footnote omitted).

[12] Cooper argues that the government's theory throughout the trial was that Cooper had leased the Lounge to Rosaline Pamela Campbell, known as Jamaica Pam; consequently, according to Cooper, only one offense had been violated--the act of executing one lease. In contrast, the government asserts that its theory was that Cooper had made the unit available on at least six occasions and received compensation each time; consequently, Cooper was guilty of multiple crack house violations. Our review of the record indicates that the government focused on "making the Lounge available" as opposed to merely leasing it.

16

does not control in all instances.  <u>Callanan v. United States</u>, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961) ("[The rule of lenity] as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity. . . . The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.").

We conclude that the rule is inapplicable here.  First, the Supreme Court precedents which develop the rule as it applies to multiple sentencing generally involve situations where a "single, uninterrupted criminal act led to multiple convictions and sentences."  <u>McDonald</u>, 692 F.2d at 379 (footnote omitted).[13]

Second, the rule of lenity merits application only if after a review of all applicable sources of legislative intent "the statute remains truly ambiguous."  <u>Id.</u>  <u>See also</u> <u>Davis</u>, 656 F.2d at 158 ("the `touchstone' of the rule of lenity is `statutory ambiguity'" and should not be utilized "to `destroy the spirit and force of the law which the legislature intended to enact'") (citations omitted).

---

[13]  <u>See, e.g.</u>, <u>Whalen v. United States</u>, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (holding that the crime of rape is a lesser included offense of the crime of felony murder in the perpetration of rape, and that since the latter crime included all of the elements of the former, consecutive sentences were therefore improper); <u>Simpson v. United States</u>, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (ruling that an individual act of bank robbery with a firearm cannot be punished with consecutive sentences for aggravated bank robbery and for using firearms to commit a robbery); <u>Ladner v. United States</u>, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (finding that the single discharge of a shotgun constitutes only a single violation of a statute prohibiting assault on a federal officer even though two officers were injured).

Moreover, when asked to interpret an earlier drug law, the Supreme Court stated that "Congress has manifested an attitude not of lenity but of severity toward violation of the narcotics laws." Gore v. United States, 357 U.S. 386, 391, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958). It is a fair assumption that this attitude has not diminished. See, e.g., H.R. 5484, 99th Cong., 2nd Sess., 132 Cong. Rec. S27161, 27161 (September 30, 1986) (Sen. DeConcini) ("[T]his legislation sends the clear message to those who decide to make their living in the insidious business of drug trafficking that we are no longer going to tolerate their activities. H.R. 5484 contains extremely stiff penalties for possessing, manufacturing, importing, or distributing drugs.").

In its goal to curtail the threat of illegal narcotics, Congress appeared particularly concerned about the impact of crack cocaine. See, e.g., 132 Cong. Rec. S26433, 26447 (September 26, 1986) (Sen. Chiles) ("[The bill] will help our law enforcement officials by strengthening criminal penalties for drugs like crack cocaine. This is an absolutely essential first step. Current law makes it very difficult to arrest and convict crack dealers and traffickers."); id. at 26435 (Sen. Chiles) ("We have enhanced the penalties for drugs, but especially for crack cocaine."). Finally, Congress specifically sought the curtailment of crack houses. Id. at 26447 (Sen. Chiles) ("Police also have difficulty arresting the operators of crack houses, the places where users congregate to purchase and use crack. When police raid these crack houses, the dealers and users can easily dispose of the drugs, thus avoiding

18

arrest.  This bill makes it a felony to operate such a house, to be present at the house.") (Sen. Chiles); id. at 27180 (September 30, 1986) (stating that the bill "recognizes crack's insidious impacts on neighborhoods by outlawing crack houses").

We conclude that the maintenance of a crack house constitutes a separate offense each day it is continued.  This Circuit has upheld multiple convictions, as long as they encompass separate transactions, even if motivated by a single financial scheme.  See, e.g., United States v. Guzman, 781 F.2d 428, 432 (5th Cir.) (per curiam) (concluding that false name on two different documents in same transaction constitutes two separate offenses under 18 U.S.C. § 1001, which prohibits the knowing and willful false representation of material fact to a United States agency), cert. denied, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); United States v. McDonald, 692 F.2d. 376, 378 (5th Cir. 1982) (finding that two separate physical deliveries of a controlled substance on two different days, all part of a single financial scheme involving the same buyer and sellers, constituted separate criminal acts subject to consecutive sentences under 21 U.S.C. § 841(a)), cert. denied, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983); United States v. Thompson, 624 F.2d 740, 742 (5th Cir. 1980) (upholding the conviction of a physician on three separate counts of dispensing a controlled substance, in violation of 21 U.S.C. § 841(a)(1), for writing three separate prescriptions to the same undercover investigator at the same time and in exchange for the same payment).

19

Cooper's actions did not represent a single impulse, as Cooper would have us find, but successive impulses, meriting separate indictments.  See Blockburger v. United States, 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed.2d 306 (1932) (citation omitted) (finding "`successive impulses . . . even though all unite in swelling a common stream of action'" and holding that each of several successive sales of narcotics, even if made to same person, constitutes a distinct offense, regardless of how closely sales follow each other).  Significantly, on at least six occasions, narcotics officers legally searched the club, seized all drugs and firearms, arrested the suspects, and effectively closed down the crack house.  Nonetheless, after each raid, Cooper and his accomplices returned to the Lounge, further fortified it, and resumed its operation.

We conclude that Section 856 is properly interpreted to provide that each unlawful "making available" of a building is a distinct offense.  Cooper committed a separate offense every day he made the building available.

The cumulative punishments were properly imposed on the facts of this case.  We adhere to the government's decision to dismiss counts 10-13, and find that Cooper's convictions on counts 3, 5, 7, 9, 14, and 16 should be upheld.

We have considered carefully Cooper's remaining contentions and found them to be without merit.  They do not raise issues serious enough to justify discussion.

We affirm the decision of the district court in all respects.

20

AFFIRMED.